RECEIVED
JUN 17 2008
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| GILBERT GALLOW | CIVIL ACTION NO. 06-0259 |
| VERSUS | JUDGE DOHERTY |
| NEWFIELD EXPLORATION CO., ET AL. | MAGISTRATE JUDGE HILL |

### MEMORANDUM RULING

Pending before this Court is the Motion for Summary Judgment filed by Grand Isle Shipyard, Inc. ("GIS") [Doc. 73]. The motion is opposed by plaintiff [Docs. 80, 93 and 99], and GIS has filed a reply brief [Doc. 102]. For the following reasons, the motion is GRANTED.

**I.   Factual and Procedural Background**

The parties agree on the factual scenario which places this matter before the Court. Plaintiff, Gilbert Gallow, asserts a claim for personal injuries arising out of an April 11, 2005 accident which occurred while he was attempting a swing rope transfer from a fixed production platform located on the Outer Continental Shelf, off the coast of the State of Louisiana, to a vessel located alongside the platform. At the time, Gallow was an employee of Global X-Ray & Testing Corp. working as a technician's helper. The platform in question, known as the Facility 1, is operated and partially owned by Newfield Exploration Company, which was also the time charterer of the vessel.[1] Gallow was attempting to transfer from the platform to the M/V QUEST, a crew boat owned and operated by Gulf Crews, Inc., which was utilized by Newfield for the transport of personnel and supplies within the West Delta Field.

---

[1] Although originally a defendant in this matter, Newfield was dismissed when the Court granted Newfield's motion for summary judgment on February 25, 2008. See Docs. 87 & 88.

On his first attempt that day, Gallow apparently did not reach the landing area on the vessel and ultimately swung back into the platform, allegedly striking his back on the beam of the Plus 5 deck supporting the grating. There were numerous other uneventful swing rope transfers in the field that day, including Gallow's second attempt to transfer to the vessel, immediately following the failed first attempt, which was successful. Sea conditions on the date of the accident were reported at three to four feet on a platform located nearby in the same field. Captain Dennis Katan of the M/V Quest testified seas were approximately three to five feet that day.[2] It is undisputed Gallow did not question whether it was safe to attempt the transfer, and both John Kevin Myers, the C&D employee acting as operator of the platform on the date in question,[3] and Captain Katan testified they did not believe sea conditions were unsafe. Myers and Katan also testified they did not believe the swing rope transfer should not be attempted.

Gallow testified that, on the date of his accident, he had already completed approximately 112 swing rope transfers in the Gulf of Mexico. In addition to the 100+ swing rope transfers Gallow

---

[2] See Deposition of Captain Dennis Katan, p. 20, ll. 7-9.

[3] C&D Production Specialist Co., Inc., which plaintiff attempted to add as a party defendant, was never successfully sued as a result of a procedural error on the part of plaintiff. On September 1, 2006, plaintiff filed a "Motion to Add Additional Party," seeking leave to add C&D Production Specialist Co., Inc. ("C&D") as a party defendant [Doc. 22]. In his motion, plaintiff stated he "desires to add C&D . . . as a party defendant, it being alleged that C&D had responsibility and was negligent in causing the accident and injuries to Gilbert Gallow." The magistrate judge granted the "Motion to Add Additional Party" by ordering "the original complaint filed on February 16, 2006 *be allowed to be supplemented and amended* to add C&D Production Specialist Company, Inc. as a party defendant." [Doc. 23 (emphasis added)]. However, plaintiff did not also, or thereafter, file a formal complaint amending his petition and asserting the specific claims and/or legal theories supporting any claims to be made against C&D.

Nevertheless, C&D filed a responsive pleading entitled "Responsive Pleading Presenting Defenses Under Rule 12B" on October 30, 2006 [Doc. 26]. When filed into the record, it was listed on the docket sheet as "Answer to Complaint and First Supplemental and Amending Complaint." Thereafter, C&D filed a motion entitled "Motion for Summary Judgment on Behalf of C&D Production Specialist Company, Inc." [Doc. 46] requesting this Court dismiss plaintiff's claims against it. In the Court's Memorandum Ruling issued February 25, 2008, the Court noted there were no claims properly pled against C&D in this matter and, consequently, no claims against C&D for the Court to consider. Therefore, the court denied C&D's motion for summary judgment. See Doc. 87. Plaintiff has declined to add C&D as a party defendant since that time.

successfully undertook prior to his accident, Gallow testified he made at least one successful swing rope transfer on April 10, 2005, two days after his GIS training session and one day before his accident.[4] On the morning of the accident, Gallow watched approximately six other men swing from Facility No. 1 to the vessel before it was his turn, and after the unsuccessful swing that caused his injury, as previously noted, Gallow successfully swung to the vessel himself.[5]

Plaintiff's original suit named as defendants his employer, Global X-Ray, and the platform operator and part-owner, Newfield. In his original complaint, plaintiff alleges his claims arise under the Jones Act, General Maritime Law, Section 905(b) of the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. §901, *et seq.*, and the doctrine of unseaworthiness.

On April 4, 2006, plaintiff filed a "Motion to Amend Complaint," seeking to add Gulf Crews, Inc., the owner/operator of the M/V QUEST, as a defendant, and seeking to dismiss Global X-Ray [Doc. 5]. The magistrate judge granted the motion, and plaintiff's first supplemental and amending complaint was subsequently filed into the record on April 6, 2006 [Doc. 7]. In the first amended complaint, plaintiff alleges that, in addition to his claims against Newfield under "the General Maritime Law and under [§]905(b)," his claims against Newfield arise "under the Outer Continental Shelf Lands Act," 43 U.S.C. §1331, *et seq.*, and "Louisiana law." Additionally, plaintiff alleges his claims against Gulf Crews arise under "[§]905(b) and the General Maritime Law;" and he dismissed his Jones Act claim against his employer, Global X-Ray.

On October 3, 2007, with leave of court, plaintiff filed a "Second Supplemental and Amending Complaint," adding Grand Isle Shipyard, Inc., the company that allegedly provided

---

[4] *See* August 15, 2006 Deposition of Gilbert Gallow, p. 24, ll.2-25. *See also* June 28, 2007 Deposition of Gilbert Gallow, at p. 18, ll. 21-25; p. 19, ll. 1-8.

[5] See June 28, 2007 Deposition of Gilbert Gallow, p. 17, ll. 5-15; p. 18, ll. 1-6; p. 28, ll. 11-17.

Gallow's swing rope transfer training, as a party defendant [Doc. 53]. Specifically, plaintiff alleges the following with respect to GIS:

> It is further alleged that GIS-ITEC through its employees and company agents are negligent in causing the accident and injuries to the plaintiff Gilbert Gallow based upon the non-exclusive acts of negligence itemized below:
>
> a) Failing to have Gilbert Gallow safely trained to perform rope transfers;
> b) Setting a standard for training of new employees who have never rope transferred and failing to follow through with that standard, in this case, failing to train Gilbert Gallow by utilizing what GIS-ITES says it has available, that is, a platform and boat necessary to train new personnel in rope transfer;
> c) Failure to advise Mr. Gallow that it had this facility available.
> d) Failure to advise his employer or any other parties that Mr. Gallow was never trained at GIS-ITEC in actual rope transfer other than video and possible lectures.[6]

The "facility" referred to in plaintiff's amended complaint is the GIS simulator consisting of a fixed "platform" and a fixed "boat" which are designed to demonstrate basic proficiency in swinging.

In his second amending complaint, plaintiff asserts "all parties . . . are liable in solido under the General Maritime Law, 905(b) of the Longshore and Harbor Workers Act, the Outer Continental Shelf Land Act, [and] Louisiana law," but cites no statutory authority for this allegation.

## II.   Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

---

[6] See Doc. 53, ¶1.

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

. . . .

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming"

> that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### III. Law and Analysis

#### A. The Outer Continental Shelf Lands Act ("OCSLA")

Plaintiff alleges his claims against GIS arise under "General Maritime Law, 905(b) of the Longshore and Harbor Workers Act, the Outer Continental Shelf Land Act, [and] Louisiana law." In its motion for summary judgment, GIS moves for "summary judgment dismissing plaintiff's claims against it, with prejudice," *without delineating the specific claims for which it seeks dismissal*; presumably GIS seeks dismissal of *all* claims brought by plaintiff against it.[7] GIS seeks dismissal of "plaintiff's claims" on grounds GIS's alleged actions were not a cause-in-fact of Gallow's injuries, and that GIS did not owe a duty to Gallow under Louisiana law.

Despite the somewhat inartful pleading of his claims against GIS and GIS's less than clear, generically-framed motion seeking dismissal of "plaintiff's claims" against it, the parties agree Gallow's claims against GIS sound exclusively in negligence. Additionally, it is undisputed the fixed platform on which Gallow's accident occurred is located on the outer continental shelf, offshore Louisiana. This Court, having no evidence to the contrary, will therefore assume plaintiff's claims against GIS arise under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §1331 *et seq.* "OCSLA adopts the law of the adjacent state (Louisiana) as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations." Fruge v. Parker Drilling Co., 337 F.3d 558, 560 (5th Cir. 2003); *see also* 43 U.S.C. §1333(a)(2)(A).

#### B. Negligence Under Louisiana Law

In general, in an action to recover damages for injuries allegedly caused by another's

---

[7] Although not abundantly clear, it appears GIS desires dismissal of *all claims* made by plaintiff; however the claims plaintiff has brought, against which defendants, what law governs each claim, what duty is owed if any, is not abundantly clear, as such has not been set forth by the plaintiff in either the original complaints or any subsequent amending complaints or by defendants by way of clarification or as movants. As Louisiana is a codal state, this lack of clarity is particularly troublesome.

negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. *Hanks v. Entergy Corp.*, 944 So.2d 564, 578 (La. 2006). Most negligence cases are resolved by employing the duty-risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). *Hanks*, 944 So.2d at 579. The plaintiff in a negligence case may meet his burden of proof by presenting both direct and circumstantial evidence. *Id.* at 579, *citing Cangelosi v. Our Lady of the Lake Med.Ctr.*, 564 So.2d 654, 664 (La.1990) (on rehearing).

Under the duty-risk analysis, it is well-settled that a court must first determine the cause-in-fact of the injury. *Jones v. Robbins*, 289 So.2d 104 (La.1974). *See also Fowler v. Roberts*, 556 So.2d 1 (La.1989) (under the duty-risk approach to determining tort liability, the court first determines whether the defendant's conduct was a cause-in-fact of the plaintiff's damages), *citing Pierre v. Allstate Ins. Co.*, 257 La. 471, 242 So.2d 821 (1970). *See also White v. McCoy*, 552 So.2d 649 (La. App. 2nd Cir.1989) ("The existence or extent of a duty need not be discussed until substantial cause-in-fact is found."). If the injury was caused by some act or omission of the alleged tort-feasor, the inquiry then becomes whether there was a legal duty which encompassed the particular risk that caused plaintiff's harm. *Fowler*, 556 So. 2d at 5.

Although plaintiff does not identify under which codal article his "negligence" claims are

couched, this Court will assume plaintiff intends his "Louisiana law" claims for "negligence" to be couched under Article 2315 of the Louisiana Civil Code. A defendant's conduct is actionable under Article 2315 where it is both a cause in fact and a legal cause of the harm incurred. *Sinitiere v. Lavergne*, 391 So.2d 821 (La.1980); *Fowler v. State Farm Fire & Casualty Ins. Co.*, 485 So.2d 168 (La.App.2d Cir.1986), *writ denied*, 487 So.2d 441 (La.1986). Cause-in-fact is usually a "but for" inquiry which tests whether the injuries would not have occurred but for the defendant's substandard conduct. *Fowler, supra*, 556 So.2d at 5. The "substantial factor" inquiry is also useful to determine cause-in-fact when the conduct of each of two or more persons actually contributes to the plaintiff's harm even though the harm would have occurred without the interaction of one. *Id. See also Saden v. Kirby*, 660 So. 2d 423, 427 (La. 1995).

Notably, Gallow does not argue the cause-in-fact element in his brief, but rather focuses on the "duty" element of the duty-risk analysis.[8] The gist of Gallow's "negligence claims" against GIS is that GIS failed to properly train plaintiff by failing to permit Gallow to make a swing on the GIS swing rope simulator during his training sessions. GIS argues that, even assuming for purposes of the instant motion plaintiff did not make a swing on the GIS swing rope simulator, such omission would not constitute a cause-in-fact of Gallow's accident under Louisiana law. GIS contends the simulator is designed to demonstrate basic proficiency in swinging only, and that because Gallow had already made over 100 successful swing rope transfers offshore before his training with GIS, it cannot be said that Gallow's accident would not have occurred but for this omission.

The record supports GIS's argument. In addition to the 100+ swing rope transfers Gallow successfully undertook prior to his accident, Gallow testified he made at least one successful swing

---

[8] Specifically, Gallow argues "[t]he actual legal issue before this Court requires the Court to focus on GIS's legal duty and whether it's [sic] conduct breached that duty."

rope transfer on April 10, 2005, two days after his GIS training session and one day before his accident.[9] On the morning of the accident, Gallow watched approximately six other men swing from Facility No. 1 to the vessel before it was his turn, and after the unsuccessful swing that caused his injury, Gallow successfully swung to the vessel himself.[10] When asked at his June 28, 2007 deposition whether swing rope transfers had become "fairly commonplace" and were "no big deal," Gallow responded, "[i]t would seem."[11] The foregoing evidence shows that Gallow had had extensive experience making swing rope transfers both before the date of his accident (April 11, 2005) and even before his GIS training (April 6-8, 2005). Therefore, Gallow's argument that GIS's failure to permit him to take a swing on the GIS simulator was the cause of his accident is unpersuasive and lacks merit.

In response to the argument that he had done more than 100 swing rope transfers prior to his accident, Gallow argues he had never swung under the precise conditions that existed at the time his accident occurred, that is, in weather with sea swells of three to five feet. However, this argument is equally unavailing. Gallow's suggestion that, had GIS simulated an *exact* replica of the weather conditions Gallow encountered on the day of his accident – which would, this Court notes, have been impossible without first knowing exactly what conditions might have come to exist on some date in the future – and had GIS permitted Gallow to swing under such conditions, his accident would not have occurred, strains credulity. Indeed, Gallow confirmed he received training at GIS, including

---

[9] *See* August 15, 2006 Deposition of Gilbert Gallow, p. 24, ll. 2-25. *See also* June 28, 2007 Deposition of Gilbert Gallow, at p. 18, ll. 21-25; p. 19, ll. 1-8.

[10] See June 28, 2007 Deposition of Gilbert Gallow, p. 17, ll. 5-15; p. 18, ll. 1-6; p. 28, ll. 11-17.

[11] *Id.* at p. 23, ll. 10-12.

video instruction and written training, but no simulated swing rope transfer.[12] The testimony of Courtney Caldarera, a GIS training instructor, confirms Gallow passed the written test conducted by GIS.[13] Finally, Gallow testified that on the day of his accident, no one told him when to swing, he alone made the decision that he could safely swing the first time he tried, and no one forced him to swing against his will.[14] The foregoing evidence does not suggest that Gallow's accident was caused by an act or omission on the part of GIS.

Gallow's argument is similarly undercut by the testimony of Ralph Bellomy, an individual who worked for Global X-Ray at the time of Gallow's accident and who completed GIS training with Gallow from April 6-8, 2005. In his response brief, *Gallow* focuses on Bellomy's testimony that he and Gallow were not trained on the simulator and that GIS was negligent in failing to provide this specific aspect of training:

| Q (by plaintiff's counsel): | The records show that you and Mr. Gallow and Mr. Tierney were trained at GIS from the 6th of April until the 8th of April in 2005. Was there anything done during the training at GIS that addressed or would address boarding a boat from a plus five platform in three to five foot swells? |
|---|---|
| A (Ralph Bellomy): | The verbal information they gave us, you know, was great and awesome, but you know, someone that's never been in that position definitely needs to go through the physical part of it. I mean that's my opinion. But the only way, other way I can feel that GIS could have bettered our safety training was to have put us through the mockup equipment. |
| Q: | And that apparently was never done? |

---

[12] *Id.* at p. 55, ll. 1-18.

[13] See Deposition of Courtney Caldarera, attached as Exhibit "C" to GIS's motion for summary judgment, at pp. 12-15.

[14] *Id.* at p. 59, ll. 5-12.

A:  No, sir, it was never done. . . .[15]

Although at first blush, plaintiff's argument would seem to have merit, it must fade in the light of the 100+ successful swing rope transfers plaintiff had completed in the Gulf of Mexico, under varying weather and sea conditions, and to and from varying vessels and platforms. The fact that plaintiff had made over 100 successful swing rope transfers prior to his accident establishes plaintiff had the requisite foundational knowledge and experience *before his GIS training and before the day of his accident* to perform swing rope transfers in the Gulf of Mexico theater. Bellomy, who received some training as did plaintiff, testified the exact weather conditions on the date of Gallow's accident could not have been replicated on the GIS simulator, and that with approximately 112 swings already under his belt, performing a swing rope transfer on the simulator would not have helped in Gallow's training at all, as follows:

Q [by Randy Theunissen, counsel for GIS]:   And although there is that setup you've described and the photos depict at Grand Isle Shipyard, would you agree with me that there's no way to duplicate every possible condition of wind, vessel side, vessel motion, vessel movement are very variable in a mocked setting?

A [by Ralph Bellomy]:   No, sir, there no way you could, you could bring them circumstances to that facility.

[. . . .]

Q:   ....My question is, having given somebody verbal instruction and then let him utilize it in a real life offshore setting with a vessel at a plus ten would be the best training wouldn't it?

A:   Yes, sir, that would be best.[16]

---

[15] See Deposition of Ralph Bellomy, pp. 32-33.

[16] *Id.* at pp. 37-38.

Later, Mr. Bellomy testified:

Q [by plaintiff's counsel]: ...Mr. Bellomy, you've told us just a second ago that you've had about you would think over the years one thousand rope swings?

A [Mr. Bellomy]: If I would have to guess, yes, sir.

Q: Do you think even with your one thousand rope swings, in looking at the apparatus that you saw through the window, do you think you would have gained anything by the practical experience from that apparatus?

A: I wouldn't have, no sir.

[...]

Q: In your experience as an instructor, do you think someone with a hundred and twelve rope transfers would have gained something by using the actual apparatus that they had out at GIS?

[...]

A: No, sir, I don't see anything where he would gain.

Q: You wouldn't see that that practical experience would not have benefitted him?

A; Well, let me see. Your question was a hundred and twelve swings before this or after this?

Q: Before this.

A: Yes. If he did a hundred and twelve before this right here, he should have known – he should know better. This wouldn't help him one bit.

[...]

Q: Do you think he would have gained anything by putting that knowledge of the classroom to use in front of the instructor on the apparatus?

A: Definitely not because we're not looking at the real world right there. This

is all mockup stuff that's not even moving.[17]

As movant, GIS bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Plaintiff has the obligation, in response to whatever evidence and argument defendant has presented within its motion for summary judgment, to produce evidence demonstrating the existence of a genuine issue of material fact as to each of the challenged elements of its case for which he will bear the burden of proof at trial. *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 762 (5th Cir. 1996). This burden is not satisfied with "some metaphysical doubt as to the material facts," nor by only a "scintilla" of evidence. *Little, supra,* at 1075.

In short, Gallow has offered no evidence showing that, but for the failure of GIS to permit Gallow to swing on the GIS simulator, his accident would not have occurred. Rather, the evidence shows that Gallow was experienced in making swing rope transfers and that a swing on the GIS simulator would have been merely superfluous to the training he actually received at GIS and overridden by his actual experience of 100+ swing rope transfers completed within actual conditions within the Gulf of Mexico. Thus, this Court concludes plaintiff has not presented sufficient evidence showing the failure of Gallow to swing on the GIS simulator was a cause-in-fact of his accident.

Because this Court has concluded that, as a matter of law, GIS's actions and/or omissions were not the cause-in fact of Gallow's injuries, there is no need for this Court to consider whether GIS owed a duty to Gallow and/or breached that duty.

GIS seeks dismissal of, presumably, all of Gallow's negligence claims against it. Because

---

[17] Id. at pp. 47-50.

all parties agree that each of those claims is based on the theory of "negligence," in particular, failure to properly train plaintiff by failing to permit Gallow to swing on the GIS simulator, and because this Court has determined plaintiff has failed to sufficiently rebut GIS's argument that GIS's omission was not a cause-in-fact of Gallow's injuries, this Court concludes all of Gallow's claims against GIS should be dismissed.

Therefore, considering the evidence and applicable law, and drawing all reasonable inferences in favor of the non-moving party, this Court concludes Gallow has failed to carry his burden to meet GIS's well-reasoned and supported motion by demonstrating by competent evidence the existence of a genuine issue of material fact warranting trial against GIS under any theory of law presented.

Consequently, GIS's motion for summary judgment [Doc. 73] requesting this Court dismiss "plaintiff's claims" against GIS is GRANTED in its entirety.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 17 day of June, 2008.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE