RECEIVED

JUL 2 9 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

GILBERT GALLOW

VERSUS

NEWFIELD EXPLORATION CO., ET AL.

CIVIL ACTION NO. 06-0259

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Pending before this Court is the Motion for Summary Judgment filed by defendant Gulf

Crews, Inc. [Doc. 107]. The motion is opposed by plaintiff [Doc. 112]. For the following reasons,

the motion is GRANTED.

### I.    Factual and Procedural Background

#### A.    The Undisputed Facts

Plaintiff, Gilbert Gallow, asserts a claim for personal injuries arising out of an April 11, 2005

accident which occurred while he was attempting a swing rope transfer from a fixed production

platform located on the Outer Continental Shelf, off the coast of the State of Louisiana, to a vessel

located alongside the platform. At the time, Gallow was an employee of Global X-Ray & Testing

Corp. working as a technician's helper. The platform in question, known as the Facility 1, is

operated and partially owned by Newfield Exploration Company, which was also the time charterer

of the vessel.[1] Gallow was attempting to transfer from the platform to the M/V QUEST, a crew boat

owned and operated by Gulf Crews, Inc., which was utilized by Newfield for the transport of

personnel and supplies within the West Delta Field.

---

[1] Although originally a defendant in this matter, Newfield was dismissed when the Court granted Newfield's
motion for summary judgment on February 25, 2008. See Docs. 87 & 88.

On his first attempt that day, Gallow's swing was unsuccessful and he swung back into the platform, allegedly striking his back on the beam of the Plus 5 deck supporting the grating. Gallow's second swing was successful, and he was able to board the vessel. There were numerous other uneventful swing rope transfers in the field that day from that platform to that vessel; sea conditions on the date of the accident were reported at three to four feet on a platform located nearby in the same field. Captain Dennis Katan of the M/V Quest testified seas were approximately three to five feet that day.[2] It is undisputed Gallow did not question whether it was safe to attempt the transfer, and both John Kevin Myers, the C&D employee acting as operator of the platform on the date in question,[3] and Captain Katan testified they did not believe sea conditions were unsafe. Myers and Katan also testified they did not believe the swing rope transfer should not be attempted.

Gallow testified that, as of the date of his accident, he had completed approximately 112 swing rope transfers in the Gulf of Mexico. In addition to the 100+ swing rope transfers Gallow successfully undertook prior to his accident, Gallow testified he had made at least one successful

---

[2] See Deposition of Captain Dennis Katan, p. 20, ll. 7-9.

[3] C&D Production Specialist Co., Inc., which plaintiff attempted to add as a party defendant, was never successfully sued as a result of a procedural error on the part of plaintiff. On September 1, 2006, plaintiff filed a "Motion to Add Additional Party," seeking leave to add C&D Production Specialist Co., Inc. ("C&D") as a party defendant [Doc. 22]. In his motion, plaintiff stated he "desires to add C&D . . . as a party defendant, it being alleged that C&D had responsibility and was negligent in causing the accident and injuries to Gilbert Gallow." The magistrate judge granted the "Motion to Add Additional Party" by ordering "the original complaint filed on February 16, 2006 *be allowed to be supplemented and amended* to add C&D Production Specialist Company, Inc. as a party defendant." [Doc. 23 (emphasis added)]. However, plaintiff did not also, or thereafter, file a formal complaint amending his petition and asserting the specific claims and/or legal theories supporting any claims to be made against C&D.

Nevertheless, C&D filed a responsive pleading entitled "Responsive Pleading Presenting Defenses Under Rule 12B" on October 30, 2006 [Doc. 26]. When filed into the record, it was listed on the docket sheet as "Answer to Complaint and First Supplemental and Amending Complaint." Thereafter, C&D filed a motion entitled "Motion for Summary Judgment on Behalf of C&D Production Specialist Company, Inc." [Doc. 46] requesting this Court dismiss plaintiff's claims against it. In the Court's Memorandum Ruling issued February 25, 2008, the Court noted there were no claims properly pled against C&D in this matter and, consequently, no claims against C&D for the Court to consider. Therefore, the court denied C&D's motion for summary judgment. See Doc. 87. Plaintiff has declined to add C&D as a party defendant since that time.

swing rope transfer on April 10, 2005, two days after his GIS training session and one day before his accident.[4] On the morning of the accident, Gallow watched approximately six other men swing from Facility No. 1 to the vessel before it was his turn, and after the unsuccessful swing that caused his injury, as previously noted, Gallow successfully swung to the vessel himself.[5]

The vessel in question is 80' in length, with a beam of 24' and gross tonnage of 98. It has an open cargo deck with dimensions of 32' by 16' and a grated landing area on the stern of the vessel for swing rope transfers. Captain Katan testified at the time of Gallow's first transfer attempt, the landing area on the back of the vessel was completely clear with no obstructions.[6] It is also undisputed the deckhand, James Taylor, was in place on the grating of the vessel's landing area at the time Gallow made his first swing attempt. In support of its motion, Gulf Crews submits a photograph of the landing area of the M/V QUEST, which depicts the vessel as it looked at the time of Gallow's accident.[7] This photograph shows the deckhand was standing on the grating on the landing deck, off to the side of the area to which the men were swinging.

Captain Katan testified if an individual wants assistance in transferring, he will request assistance form the deckhand, and it is not typical for deckhands to be standing on the landing area waiting to catch individuals when they come onto the vessel.[8] Kevin Myers confirmed this in his

---

[4] *See* August 15, 2006 Deposition of Gilbert Gallow, p. 24, ll.2-25. *See also* June 28, 2007 Deposition of Gilbert Gallow, at p. 18, ll. 21-25; p. 19, ll. 1-8.

[5] See June 28, 2007 Deposition of Gilbert Gallow, p. 17, ll. 5-15; p. 18, ll. 1-6; p. 28, ll. 11-17.

[6] See Deposition of Captain Katan, at pp. 28-29.

[7] See Exhibits 1 & 2 attached to Gulf Crews's motion for summary judgment. Doc. 107. It is noted Exhibit 1 does not depict the tires that were hanging from the stern of the vessel on the day of Gallow's accident. However, Exhibit 2, a photograph which appears on the same page as Exhibit 1, does depict the location of the tires.

[8] *See* Deposition of Captain Katan, pp. 32-33.

testimony.[9]

## B. The Disputed Facts

The only disputed fact appears to be whether Gallow ever actually made contact with the vessel on his first swing attempt. Captain Katan tesified he did not see Gallow make contact with the vessel on his first swing attempt.[10] Kevin Myers testified similarly. Gallow, however, testified his feet made contact with the "tip" of the vessel. This difference is material to the extent it may affect this Court's determination as to whether the deckhand *could* or *should* have assisted Gallow on his first transfer attempt, and, at first blush, this disputed fact would appear to preclude the entry of summary judgment. Nevertheless, for the reasons stated below, the existence of this disputed fact does not preclude summary judgment, because even if this Court were to assume the plaintiff's version of events were true, this Court concludes there was no negligence on the part of the vessel.

## C. Procedural History

Plaintiff's original suit named as defendants his employer, Global X-Ray, and the platform operator and part-owner, Newfield. In his original complaint, plaintiff alleges his claims arise under the Jones Act, General Maritime Law, Section 905(b) of the Longshore and Harbor Workers Compensation Act ("LHWCA"), 33 U.S.C. §901, *et seq.*, and the doctrine of unseaworthiness.

On April 4, 2006, plaintiff filed a "Motion to Amend Complaint," seeking to add Gulf Crews, Inc., the owner/operator of the M/V QUEST, as a defendant, and seeking to dismiss Global X-Ray [Doc. 5]. In the Amended Complaint, plaintiff alleges the following claims against Gulf Crews:

II.

On April 11, 2005, GILBERT GALLOW was injured based upon the

---

[9] See Deposition of Kevin Myers, at pp. 33-34.

[10] See Deposition of Captain Katan, p. 37, ll. 8-11.

negligence of the vessel Quest in the constructive control of NEWFIELD EXPLORATION COMPANY and/or GULF CREWS, INC., owner and/or operator pro hac vice at the time of the accident and that these defendants are liable in solido under the General Maritime Law and under section 905(b) of the Longshoreman and Harbor Workers Act and that NEWFIELD EXPLORATION COMPANY is liable to plaintiff based upon its negligence under the Outer Continental Lands Act and Louisiana law.

[. . .]

## V.

It is alleged on information and belief that at the times pertinent herein defendants GULF CREWS, INC. AND NEWFIELD EXPLORATION COMPANY were the owners pro hac vice of the Quest, believed to be the vessel whose negligence under 905(b) and the General Maritime Law caused his accident and injuries. It is also alleged on information and belief that Mr. Gallow has not been provided proper treatment by the parties responsible for his accident, and that the acts of negligence are itemized nonspecifically as follows:

1. Improperly boarding crew members from the Newfield platform onto the Quest;
2. Failure to have sufficient personnel basket and procedure to allow personnel, specifically Gilbert Gallow onto the crew boat Quest;
3. Boarding or attempting to board crew members, in this case, Gallow, employed by Global during seas that were violent and/or rough;
4. Improperly positioning the crew boat and/or supply boat when taking on crew members, specifically Gilbert Gallow, an employee of Global.[11]

---

[11] Exactly what claims the plaintiff is alleging against Gulf Crews has been unclear since the inception of this litigation, as plaintiff combines his claims against Newfield and Gulf Crews into a single paragraph, with no clarification as to whether each claim is alleged against each of these defendants, or whether some of the claims pertain to only one of these defendants. Additionally, plaintiff generically alleges his claims against Gulf Crews under both the general maritime law and Section 905(b), without clarifying which claims arise under which law as to which defendant.

After review of the claims alleged, it is factually apparent certain of the claims seem to be directed against Newfield, and some against Gulf Crews. For example, in Claim No. 2, set forth above, there is a claim for "failure to have [a] sufficient personnel basket." This claim can only apply to Newfield, as Newfield provided the method of transfer – the swing rope –as opposed to a personnel basket. However, to the extent that claim alleges a claim for "failure to have a *procedure* to allow personnel, specifically Gilbert Gallow onto the crew boat Quest," this Court concludes such claim could be alleged against Gulf Crews. The foregoing is illustrative of the difficulty this Court has had in attempting to determine which claims are alleged against which defendants, under which law.

The magistrate judge granted plaintiff's motion to amend, and plaintiff's first supplemental and amending complaint was subsequently filed into the record on April 6, 2006 [Doc. 7].[12]

On October 3, 2007, with leave of court, plaintiff filed a "Second Supplemental and Amending Complaint," adding Grand Isle Shipyard, Inc., the company that allegedly provided Gallow's swing rope transfer training, as a party defendant [Doc. 53]. In his second amending complaint, plaintiff asserts "all parties . . . are liable in solido under the General Maritime Law, 905(b) of the Longshore and Harbor Workers Act, the Outer Continental Shelf Land Act, [and] Louisiana law," but cites no statutory authority for this overly broad and incorrect allegation.

Gulf Crews filed its first motion for summary judgment on September 11, 1997 [Doc. 48]. On February 25, 2008, this Court issued a Memorandum Ruling, in which the Court ruled on Gulf Crews's motion, along with motions for summary judgment filed by Newfield and C&D. With respect to the claims alleged against Gulf Crews, this Court ruled as follows:

> Summary judgment is GRANTED in favor of Gulf Crews with respect to plaintiff's Section 905(b) negligence claims based on theories of liability that the vessel owner was negligent in permitting swing rope transfers given the weather conditions; that the vessel owner was negligent in permitting swing rope transfers when water was lapping onto the vessel's deck; that the vessel owner was negligent in its placement vis-a-vis the platform at the time of plaintiff's accident; and that the vessel owner was negligent because its captain did not know – but should have known – that plaintiff was untrained in swing rope transfers. Thus, plaintiff's negligence claims asserted against Gulf Crews based on the foregoing theories of liability are DISMISSED WITH PREJUDICE. (2) Gulf Crews's motion for summary judgment is DENIED with respect to plaintiff's negligence claims based on the theory of liability that the deckhand's failure to assist plaintiff with his first transfer attempt breached the vessel's duty to provide a reasonably safe ingress to the vessel, inasmuch as neither party has carried its burden on this issue and this Court does not have sufficient information to make a determination thereon.[13]

---

[12] This Court notes in his First Supplemental and Amending Complaint, plaintiff dismissed his Jones Act claim against his employer, Global X-Ray.

[13] See Docs. 87 & 88.

Thus, this Court has already dismissed plaintiff's claims that Gulf Crews was negligent in "boarding or attempting to board crew members . . . during seas that were violent and/or rough" and in "improperly positioning the crew boat and/or supply boat when taking on crew members." Thus, the only issue remaining claims against Gulf Crews – and the only issues raised in the instant motion for summary judgment – are whether Gulf Crews was negligent in "improperly boarding crew members from the . . . platform onto the [vessel]" and in failing to "have sufficient . . . procedure" to allow Gallow onto the vessel. As is clarified in the briefing of the parties, the essence of these two claims is whether Gulf Crews was negligent in failing to have a deckhand assist Gallow with his first transfer attempt.

## II.     Summary Judgment Standard

"A party against whom a claim. counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories. and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading. but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment. if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

. . . .

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

## III. Law and Analysis

### A. Negligence under Section 905(b) of the LHWCA

Plaintiff alleges negligence against Gulf Crews, Inc., owner of the M/V QUEST, under both the "General Maritime Law" and Section 905(b) of the LHWCA for "improperly boarding crew members from the . . . platform onto the [vessel]" and in failing to "have sufficient . . . procedure" to allow Gallow onto the vessel. As this Court has noted, the essence of these two claims is that Gulf Crews was negligent in failing to have a deckhand assist Gallow with his first transfer attempt. In its motion for summary judgment, GIS alleges "summary judgment should be granted on the remaining issue of liability with respect to the deckhand in favor of Gulf Crews, Inc. and those claims of Plaintiff against Mover should be dismissed, with prejudice."

Section 905(b) states in pertinent part:

(b) Negligence of vessel
In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . ..

33 U.S.C. §905(b).

This Court notes that, as an initial matter, neither party sets forth the applicable law and/or legal standard governing plaintiff's claims against Gulf Crews or the legal framework under which this Court should analyze plaintiff's claims. This failure is particularly problematic in this case, because the plaintiff has heretofore failed to clearly and adequately allege the basis in law for his negligence claims against Gulf Crews. Despite the lack of clarity, however, this Court concludes plaintiff's claims fail under *either* the general maritime law or Section 905(b), should there be a substantive legal distinction. Because the legal standard to be applied to such claims appears to be rather unsettled under the current jurisprudence, a brief review of the LWHCA is in order to explain this Court's conclusion as to the proper legal standard to be applied.

Prior to 1972, pursuant to then existing jurisprudence a longshoreman injured in the course of his employment had several bases upon which he could recover for his injuries in tort and workers' compensation, to wit: (1) he could receive workers' compensation payments from his employer, regardless of the fault of his employer, the stevedore; and (2) he could bring an action against the owner of the non-employer vessel and could recover if he could prove that he had been injured either because the vessel owner was negligent or because the ship was unseaworthy. No showing of fault on the part of the vessel owner was necessary to support the unseaworthiness claim. Thus, even if the unseaworthy condition had been created by or was within the control of the

stevedore, the shipowner could be liable for the longshoreman's injuries. *See Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1034-35 (5ᵗʰ Cir. 1983), *citing generally Scindia Steam Navigations Company v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1246 (5ᵗʰ Cir.1982); *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 113 (5ᵗʰ Cir.1981).

Also in play prior to 1972 was the United States Supreme Court's decision in *Kermarec v. Compagnie Generale Transatlantique*, in which the Court held "a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." 358 U.S. 625, 630, 79 S.Ct. 406, 409 (1959), *citing Leathers v. Blessing*, 105 U.S. 626, 26 L.Ed. 1192; *The Max Morris*, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586; *The Admiral Peoples*, 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633. This duty has since been held to encompass the duty to provide a safe means of access to and from the vessel. *Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1217 (5ᵗʰ Cir. 1993). *See also Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 679 (5ᵗʰ Cir.1969) (shipowner has duty to provide safe egress *for crewmembers*), *cert. denied*, 90 S.Ct. 282 (1970). *See also Ross v. John E. Graham & Sons*, 1999 WL 511360, *1 (5ᵗʰ Cir. 1999) (unpublished) ("A vessel owner must provide *a passenger* with a reasonably safe means of boarding or disembarking, including the provision of proper gangways, landing places, *and personnel assistance*.") (emphasis added).

In 1972, Congress amended the LHWCA and substituted negligence for unseaworthiness as a standard of liability of the shipowner.[14] The amendment also abolished the shipowner's right of indemnity against the stevedore. *See* 33 U.S.C. § 905(b). Since the 1972 amendments, liability is

---

[14] Historically, an argument can be made that 905(b) was directed toward *employers who are vessel owners*, however again, historically the *application of 905(b)* has not been limited in that fashion.

imposed upon the vessel owner only for the failure of the vessel owner to exercise reasonable care. Although a negligence standard was incorporated under Section 905(b), the specifics of that legal standard were not defined, but rather, were "left to be resolved through the application of accepted principles of tort law and the ordinary process of litigation." *See Helaire*, 709 F.2d at 1035.

Furthermore, in *Smith v. M/V Captain Fred*, 546 F.2d 119 (5th Cir. 1977), the Fifth Circuit analyzed the applicability of Section 905(b) when longshoremen working on a vessel owned by their employer are injured through the fault of members of the crew of the vessel. In *M/V Captain Fred*, the court held "an employee may sue his employer qua vessel if he was injured as a result of the vessel's negligence." *M/V Captain Fred*, 546 F.2d at 123. The Fifth Circuit later went on to apply the precepts of M/V Captrain Fred when crew members were not performing stevedore work. *See, e.g., Bossard v. Port Allen Marine Serv., Inc.*, 624 F.2d 671 (5th Cir. 1980) (*per curiam*). Nevertheless, the Fifth Circuit has noted the scope of *M/V Captain Fred* is limited by the statute itself, which provides that an action for "negligence of a vessel" cannot be brought "if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." *See Cavalier v. T. Smith and Son, Inc.*, 668 F.2d 861 (5th Cir. 1982).

Additional clues as to how courts should fashion a legal standard to be applied under Section 905(b) have come in bits and pieces from the jurisprudence over the years. For instance, the Fifth Circuit has indicated Section 905(b) did not create a *new cause of action* for negligence, but rather, merely reinstated an already-existing *right of action* of longshoremen to recover for third-party negligence. *See, e.g., Russell v. Atlantic & Gulf Stevedores*, 625 F.2d 71, 71 (5th Cir. 1980). In *Russell,* a case dealing with the issue of whether Section 905(b) provides a jurisdictional basis under 28 U.S.C. §1331, the court stated:

In *Parker v. South Louisiana Contractors, Inc.,* 5th Cir. 1976, 537 F.2d 113, cert.

denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582, it was held that Section 905(b):

> "Eliminates only an injured worker's right to bring actions against third parties based on unseaworthiness, and preserves his right under prior law to recover for third party negligence . . . *(T)he relevant legislative history . . . leaves little doubt that Congress did not intend section 905(b) to create a new or broader cause of action in admiralty . . . ."* 537 F.2d at 117.

> *It was decided that because Section 905(b) did not create a new negligence cause of action but merely preserved an injured worker's right to recover damages from third parties in accordance with nonstatutory negligence principles,* it could not serve as the basis for jurisdiction under 28 U.S.C.A. Section 1337. Just as Section 905(b) cannot provide a jurisdictional base under Section 1337, it cannot so serve under Section 1331.

625 F.2d at 72 (emphasis added). The foregoing case seems to indicate the drafters of Section 905(b) intended for principles of *general* negligence law to be applied as the legal standard under Section 905(b).

Despite the foregoing, since the amendments, the circuits have disagreed as to the standard to be applied, and in 1977, the Fifth Circuit, along with the Second and Fourth Circuits, adopted the land-based approach of the Restatement (Second) of Torts (1965), §§343 and 343A. *See Gay v. Ocean Transport and Trading, Ltd.,* 546 F.2d 1233, 1238 (5th Cir.1977), *cited in Helaire,* 709 F.2d at 1035. *See also Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236 (5th Cir. 1981) (endorsing the district court's use of the land-based negligence standard found in Sections 343 and 343A of the Restatement Second of Torts).

Section 343 of the Restatement Second of Torts states:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
> *(c) fails to exercise reasonable care to protect them against the danger.*

Restatement (Second) of Torts §343 (1965-2008).[15]

The adoption of the Restatement, while perhaps providing some guidance on the issue, did not resolve the issue, and in 1981, the United States Supreme Court attempted to resolve the conflicting decisions of the circuits in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In *Scindia*, a longshoreman was injured by sacks of wheat which fell from a pallet suspended by a defective ship's winch. The winch had been malfunctioning for two days prior to the accident, but the stevedore continued to use it. 451 U.S. at 156. Because the Supreme Court found there was a triable issue of fact as to whether the owner had "actual knowledge" of the failure of the winch mechanism, the Court reversed the lower court's granting of a summary judgment for the owner and remanded for a determination of whether the owner had a duty to intervene and stop the unloading process. *Id.* at 178. It has been recognized that one of the primary principles that emerged from the *Scindia* case is that the primary responsibility for the safety of the longshoremen rests with the stevedore. *See Helaire*, 709 F.2d at 1036.

However, when the longshoreman gains his status as a longshoreman, not because he is a stevedore, but because he's engaged in the production of oil and gas on the Outer Continental Shelf, the jurisprudence has not been as helpful. The jurisprudence blurs the two situations and has created, unnecessarily, a morass. It is not clear whether the line of cases defining the duties *of stevedores*

---

[15] Section 343A of the Restatement states:

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated.

Restatement (Second) of Torts §343A (1965-2008).

pursuant to *Scindia* should apply to negligence cases in which no stevedore is involved and which involve, say, passengers injured on a vessel who are longshoreman, but not engaged in stevedoring services on the vessel. That is the question this Court confronts today. In resolving this issue, the Court finds some indication as to the legal standard to be applied in *Scindia* itself. In *Scindia*, the Supreme Court appeared to re-affirm the standard set forth in *Kermarec*, to wit:

> The Court of Appeals referred to its standard as being a "reasonable care under the circumstances" approach. *Id.*, at 486. It found support for this formulation in *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In that case, a visitor paying a social call on a member of the ship's crew was injured when he fell on a defective stairway. The jury found the shipowner negligent and returned a verdict, which was set aside on appeal because the visitor had been a licensee rather than an invitee. *This Court reversed, preferring to adopt a single duty of "exercising reasonable care under the circumstances of each case," rather than to incorporate in the maritime law the complexities of the common law of invitee and licensee. Id.*, at 632, 79 S.Ct., at 410. The *Kermarec* standard was reaffirmed in *Marine Terminals v. Burnside Shipping Co.*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969), a case involving a suit by a stevedore against the shipowner. *We have no quarrel with this standard. Inevitably, however, the rule will undergo refinement as it is applied to various categories of cases.*

*Scindia*, 451 U.S. at 163 n.10 (emphasis added). Additionally, the *Scindia* Court appeared to call into question the validity of utilizing Sections 343 and 343A of the Restatement in analyzing *all* claims of negligence under 905(b):

> Because the legislative history suggests that the shipowner's liability is to be judged by land-based standards, [ . . . ] it is urged that the District Court properly turned to and applied §§ 343 and 343A of the Restatement (Second) of Torts. *But the legislative history does not refer to the Restatement and also states that land-based principles of assumption of risk and contributory negligence are not to be applied in § 905(b) cases. This strongly suggests, as Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), indicated, that maritime negligence actions are not necessarily to be governed by principles applicable in nonmaritime contexts. Furthermore, since the lower courts are in disagreement not only as to the applicability of §§ 343 and 343A but also as to their import and meaning when applied in the maritime context, those sections, while not irrelevant, do not furnish sure guidance in cases such as this.*

*Id.* at 168 n.14 (emphasis added).

In *Helaire*, the Fifth Circuit acknowledged the *Scindia* opinion "does not address every issue of vessel owner liability under § 905(b)," but rather "addresses the extent of the owner's liability in situations where a longshoreman is injured *as a result of the negligence of the stevedore*." *Helaire*, 709 F.2d at 1035-36 (emphasis added). The Fifth Circuit went on to note "[t]he impact of the Supreme Court's decision in *Scindia* upon the extent of a vessel's duty to longshoremen under 33 U.S.C. § 905(b) as previously applied in this Circuit under the Restatement standard remains less than clear." *Id.* at 1036. This Court notes the foregoing is particularly true in cases in which the actions or omissions at issue were not caused by a stevedore, but involve an injured longshoreman.

To illustrate the lack of clarity and the dearth of authority in this circuit on the issue that remains some 18 years after the *Scindia* case was decided, this Court cites the unpublished Fifth Circuit opinion of *Ross v. John E. Graham & Sons*, 1999 WL 511360, 189 F.3d 466 (5th Cir. 1999). Although this Court is aware the *Ross* case is unpublished, and therefore, lacks precedential value, the case is worth noting if only to point out that the Fifth Circuit, along with other circuits, has yet to clarify a precise standard to be employed in cases such as the instant case.

In *Ross*, plaintiffs brought an action against a vessel owner for personal injuries sustained by Bobby Ross while disembarking from the vessel. Plaintiffs appealed the district court's judgment in favor of the vessel arguing the district court (1) erroneously defined the scope of a vessel owner's duty of care to a disembarking passenger, and (2) erred in finding the vessel did not breach its duty of care. The district court had explained that a shipowner's duty of care has been defined, alternately, as a "high" degree of care for the safety of passengers and as a duty of exercising "reasonable" care under the circumstances. 1999 WL 511360, *1. Plaintiffs argued a shipowner's duty is always a duty of "high" care. *Id.*

Reviewing the issue *de novo*, the Fifth Circuit noted the *Kermarec* standard of "reasonable

-16-

care under the circumstances of each case." Noting it has stated, in some instances, reasonable care under the circumstances may be something less than high care, *Smith v. Southern Gulf Marine Co. No. 2, Inc.*, 791 F.2d 416, 421 (5th Cir.1986), the court concluded:

> *Without attempting to define a "precise" standard, we have stated that we will continue to adhere to the standard described in Kermarec, which is reasonable care under the circumstances of each case.* The district court articulated this standard of care, and thus the district court correctly defined the scope of the duty of care.
>
> [. . .]
>
> A vessel owner must provide a passenger with a reasonably safe means of boarding or disembarking, including the provision of proper gangways, *landing places*, and personnel assistance. *See, e.g., Lavergne v. Chevron U.S.A. Inc*, 782 F.Supp. 1163, 1169 (W.D.La.1991); *Counts v. Lafayette Crewboats, Inc.*, 622 F.Supp. 299, 301 (W.D.La.1983).

*Ross*, 1999 WL 511360, 1 (internal citations omitted) (emphasis added). *See also Forrester v. Ocean Marine Indem. Co.*, 11 F.3d 1213, 1216 (5th Cir. 1993) ("In this circuit, the standard of care owed to passengers on a ship, including their embarkation and disembarkation, has variously been stated as a "high degree of care," as a "duty of ... ordinary care," "as a reasonably safe means" of boarding and leaving the vessel, as a duty of "reasonable care," and "as a duty of reasonable care under the circumstances.").

Considering the foregoing, and in the absence of a precise, articulated standard for negligence under Section 905(b) in the Fifth Circuit in cases which do not involve the actions or omissions of a stevedore, but do involve a longshoreman, this Court will employ the standard described in *Kermarec*, which is "reasonable care under the circumstances of each case." 358 U.S. at 630. With the foregoing in mind, this Court notes, again, Gallow contends Gulf Crews was negligent in failing to have a deckhand assist Gallow with his first transfer attempt. The inquiry for this Court is, therefore, whether the vessel and its deckhand employed "reasonable care under the circumstances."

After review of the record, this Court concludes the deckhand's actions/inactions were "reasonable under the circumstances."

## B.    Analysis of Claim

First, as movant, Gulf Crews bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Gallow has the obligation, in response to whatever evidence and argument Gulf Crews has presented within its motion for summary judgment, to produce evidence demonstrating the existence of a genuine issue of material fact as to each of the challenged elements of its case for which he will bear the burden of proof at trial. *Rizzo v. Children's World Learning Ctr.*, 84 F.3d 758, 762 (5th Cir. 1996). This burden is not satisfied with "some metaphysical doubt as to the material facts," nor by only a "scintilla" of evidence. *Little, supra,* at 1075.

Here, Gulf Crews contends Gallow testified noone told him when to swing and the timing of the swing was his decision alone.[15] Further, Gulf Crews alleges Gallow admits when he began his swing attempt, both of his hands were holding securely onto the rope, but that, as he neared the vessel, he released his left hand from the rope in preparation to attempt to grab the railing on the stern of the vessel. Gallow testified as his feet touched the tip of the vessel, his right hand slipped on the rope. When asked whether his right hand slipped on only one knot or more, Gallow testified he did not remember how many knots, but that, "when it was all over with, I was at the last knot."[16]

---

[15] See August 15, 2006 Deposition of Gilbert Gallow, at 56, ll. 2-15.

[16] *Id.* at 64, ll. 9-11.

With respect to whether his feet actually touched the deck of the vessel, Gallow testified at

his first deposition on August 15, 2006 as follows:

Q:    All right. Did your feet ever touch the deck?
A:    Yes.
Q:    – in between the rail and the tires?
A:    Yes, that it where I slipped off of the deck.
Q:    Were you standing upright on the deck?
A:    No, I was trying to reach for it. It was like a lean with a rope.
Q:    Okay. I'm trying to figure out what your position was. When you swing on the rope you are just holding on with one hand or two when you are swinging across?
A:    On my first one I'm holding on with two hands.
Q:    Alright.
A:    Right before I get to try to reach, then I was holding one hand and I'm reaching with the other hand.[17]

[. . .]

Q:    When you are getting on to the vessel is your body at an angle when you are trying to come down on to the vessel?
A:    Yes.
Q:    And when you get your feet on the deck and you are letting go of the rope with one hand to grab to the rail, can you tell me what angle you are at that time when you are trying to get on to the vessel?
A:    I can't tell you how much of an angle, but I know I was angled.
Q:    Let's do this. This is a ninety-degree (indicating) as opposed to like -- Here is the boat (indicating). Straight up is 90 degrees. This would be forty-five degrees (indicating).
A:    About like that.
Q:    So you are at about a 45-degree angle?
A:    About like that.
Q:    Okay. Did your feet ever touch the tires before the boat came back up?
A:    What do you mean?
Q:    Here is the boat (indicating). What I want to know is when you are swinging if these are your feet (indicating), did your feet clear the boat, come down like this (indicating) and then slide off and then hit the tires or did your feet -- When the boat is coming up did it catch the tires and you are trying to crawl up, you know, with your feet? You know how when you were a kid you could have a rope and you could kind of walk up a wall or something like – You know what I'm talking about?

---

[17] *Id.* at p. 66, ll. 4-22.

A:    Yeah, I know what you are talking about.

Q:    Okay.

A:    No, I cleared the boat.

Q:    You cleared the boat.


A:    It just came up, my feet touched the deck and I slipped off the deck and my feet touched the tires. Some kind of way it got hooked on them tires. I took my feet off of them tires. By the time the boat got back all the way up in the air and it came back down, that is when it hit me.

Q:    So the boat is continuing to go up, your feet are on the tires; right?

A:    Slipped off.

Q:    Your feet slipped off the tires, the boat is continuing to go up?

A:    Not off the tire, I slipped off – I slipped off the deck and it got on them tires.

Q:    All right.

A:    I guess between the tires and that chain and I pulled my feet back.

Q:    All right.

A:    And it continued to go up.

Q:    So the boat continued to go up.

A:    Yes.

Q:    Your feet weren't on the tires anymore, you pulled them away from them.

A:    Right, I am hanging on the rope. I assume at that point the rope would start swinging back.

Q:    It started swinging back.[18]

Thus, by Gallow's own testimony, Gallow made the decision as to the timing of his swing; chose to swing when the vessel was on its way up; and let go of the rope with one hand in anticipation of grabbing the handrail on the vessel. Gallow confirms as his feet touched the top of the vessel, he lost his grip on the rope and began sliding down the rope; at the same time, the vessel was beginning to rise. Gallow testified he was at a 45-degree angle to the boat when his feet touched the tip of the vessel and he was never standing upright on the landing area of the vessel. Rather, as the vessel rose, Gallow's feet slipped from the edge of the stern onto the tires that were suspended from the stern of the vessel and got tangled in the tires. Thereafter, Gallow continued to slide down the rope, until he reached the last knot, while the vessel continued to rise above him. As the vessel

---

[18] *Id.* at p. 67-70, ll. 16-16.

began its descent, it allegedly struck Gallow and pushed him back into the Plus 5 deck.

At his second deposition on June 28, 2007, Gallow clarified the contact he made with the vessel during his transfer:

> Q: Did your feet ever actually get onto an area of the grating?
> A: Half and half. Like part of my foot touched it and part of my foot touched that part.
>
> [. . .]
>
> Q: So your foot, if I'm understanding correctly – we talked about heel to toes, maybe in the middle of your foot kind of was on the rail?
> A: Yes.[19]

Thus, even assuming Gallow's version of events, Gallow confirms he was never standing flatfooted and upright on the landing area of the vessel. Rather, his feet came into contact with the top edge of the stern of the vessel, and his body was at an approximate 45-degree angle to the surface of the vessel itself. As his feet slipped off the edge of the vessel, they became entangled in the tires, and Gallow had to pull his feet away from the tires.

With the foregoing in mind, this Court must determine whether the deckhand was negligent in failing to render assistance to Gallow during his first swing attempt. Under the circumstances as alleged by Gallow, the Court concludes he was not.

First, the Court notes the testimony of Captain Katan, whose testimony is not relied upon as an expert opinion, but as an eyewitness to the events that transpired. Captain Katan confirmed as soon as it became apparent Gallow had not made it to the vessel on his first attempt, per protocol, Captain Katan switched the vessel's engines in neutral to avoid pushing Gallow into the platform. With respect to the duties of the deckhand at that time, Captain Katan testified as follows:

---

[19] See June 28, 2007 Deposition of Gilbert Gallow, at p. 61, ll. 11-20.

A:   There was really nothing [the deckhand] could do. [Gallow] was too far down to – he wasn't even near, you know, being able to complete the transfer[], so there was nothing [the deckhand] could do.

Q:   In that instance you would not expect the deckhand to try to crawl down and pull him back up?

A:   Absolutely not.

Q:   The safest procedure is to let him go back to the platform and attempt a second swing rope transfer?

A:   Correct.[20]

Thus, Gallow's body was at a 45-degree angle to the surface of the vessel and his feet were not securely on the landing area of the vessel at any time. Furthermore, Gallow's feet briefly became entangled in the tires that were suspended from the stern of the vessel. Considering the foregoing, this Court concludes the deckhand's failure to assist Gallow in his first transfer attempt was not unreasonable. Indeed, as noted by Captain Katan, it appears the deckhand actually took the safest action possible, which was to allow Gallow to swing back to the platform to attempt a second swing. Gallow has offered no evidence showing that there was a more reasonable course of action for the deckhand to take without risking serious injury either to Gallow or himself.

Finally, this Court notes the law of the Fifth Circuit is clear that "there is nothing dangerous in the swing rope transfer in the abstract." *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1521 (th Cir. 1996). *See also Musial v. A & A Boats, Inc.*, 696 F.2d 1149 (5th Cir. 1983) (noting that swing rope transfers are "an accepted mode of boarding [a] tender vessel" from a platform). Furthermore, there has been no evidence the swing rope transfers performed in this case were particularly dangerous, either because of weather conditions or the conduct of the vessel.

Accordingly, this Court concludes Gallow has failed to sufficiently rebut Gulf Crews's well-reasoned argument that the vessel and its deckhand were not negligent in failing to assist Gallow on

---

[20] See Deposition of Captain Katan, at p. 38, ll. 11-23.

his first swing attempt. Consequently, this Court concludes Gallow's remaining claims against Gulf Crews should be dismissed.

Therefore, considering the evidence and applicable law, and drawing all reasonable inferences in favor of the non-moving party, this Court concludes Gallow has failed to carry his burden to meet Gulf Crews's well-reasoned and supported motion by demonstrating by competent evidence the existence of a genuine issue of material fact warranting trial against Guld Crews under any theory of law presented. Consequently, Gulf Crews's motion for summary judgment [Doc. 107] requesting this Court dismiss Gallow's remaining claims against Gulf Crews, alleging Gulf Crews was negligent in "improperly boarding crew members from the . . . platform onto the [vessel]" and in failing to "have sufficient . . . procedure" to allow Gallow onto the vessel, is GRANTED in its entirety, and these claims are DISMISSED WITH PREJUDICE.

The dismissal of the foregoing claims resolves this lawsuit. Therefore, IT IS FURTHER ORDERED that the parties submit a proposed judgment, approved as to form, to the Court within ten days of receipt of this Order.

THUS DONE AND SIGNED in Lafayette. Louisiana, this **24** day of July, 2008.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE